**Dennis WILSON**

v.

**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY.**

**Hubert C. CRANFORD**

v.

**LEADER NATIONAL INSURANCE COMPANY.**

**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY**

v.

**Robert A. SNEED.**

**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY**

v.

**Robert A. SNEED, Jr.**

**Civ. Nos. C84–1175, C82–1067, C81–2303 and C81–2319.**

United States District Court, N.D. Georgia, Atlanta Division.

Feb. 1, 1985.

Timothy A. Siler, Siler & Jonap, Decatur, Ga., for Wilson.

Douglas E. Cobb, Oxedine & Assoc., Norcross, Ga., for Cranford.

Allen Gordon, Walbert & Hermann, Atlanta, Ga., for Sneeds.

Jerry Blackstock, James D. Meadows, Powell, Goldstein, Frazer & Murphy, Atlanta, Ga., for State Farm.

Roger Mills, Long, Weinberg, Ansley & Wheeler, Atlanta, Ga., for Leader National.

## ORDER

ORINDA D. EVANS, District Judge.

Each of the above-captioned Jones cases [1] is currently before the court on motions for summary judgment filed by the insurer.[2] Although each involves entirely different facts, all present a common issue, namely, how to treat—substantively and procedurally—the issue of the insured's allegedly false signature on the insurance application. Is the matter of the allegedly false signature an element of the insured's case? Or must the insurance company prove the validity of the insured's signature? Where the insured is claiming that the signature is not his, but does not claim that he made no knowing rejection of optional coverages, can he collect based on Jones theory?

### A. FACTS

The relevant facts in each case before the court are now outlined.

### Wilson Case

In his complaint filed May 3, 1984, Mr. Wilson alleges that he was injured in an accident in August 1982 and that he then was insured under State Farm Policy No. 686 0282–C21–11A. The complaint further alleges that State Farm did not offer Mr. Wilson optional PIP coverage "in the man-

---

1. "Jones" cases are cases where an insured seeks additional post-risk personal injury protection ("PIP") no-fault coverage from his carrier. In such cases the claim is that the insurer failed to comply with certain requirements of Georgia's no-fault act pertaining to the manner of offering optional no-fault coverage above the mandatory $5,000 minimum. A successful Jones case increases post-accident PIP coverage to $50,000. The first case recognizing such cause of action was Jones v. State Farm, 156 Ga.App. 230, 274 S.E.2d 623 (1980) (cert. dismissed). The guidelines set down in Jones were later substantially revised and clarified in Flewellen v. Atlanta Casualty Company, 250 Ga. 709, 300 S.E.2d 673 (1983) and in other decisions of the Georgia Supreme Court, but the reference "Jones cases" seems to have stuck. Therefore, the terms Jones cases, Jones theory, and Jones contract will be used descriptively in this order.

2. These cases have not been consolidated.

ner required by Ga.Code Annotated Section 33–34–5." Complaint, ¶ 8. The complaint states that on January 24, 1984, Plaintiff elected to accept the maximum PIP coverage of $50,000, through the vehicle of a letter from his attorney Timothy A. Siler.

After Defendant answered the complaint, it filed a motion for summary judgment. Appended to the motion is a copy of Mr. Wilson's insurance application on Policy No. 686 0282–C21–11A. The insurance application reflects "X" marks in the "reject" boxes for the $10,000, $25,000 and $50,000 levels of personal injury protection. Immediately under that, following the statement "I made the acceptance/rejection of coverage" is the signature "Dennis Wilson." Separate sections of the application dealt with collision, loss of use and comprehensive insurance, each section having its own "accept" and "reject" blocks with separate signature spaces. Each of these sections shows "X's" in certain blocks and a signature "Dennis Wilson." State Farm argues that this format complies with the Georgia Supreme Court's ruling in *Flewellen, supra* at 711, 300 S.E.2d 673. Additionally, the motion for summary judgment appends an affidavit of State Farm's resident claims superintendent, who states that at the time of Mr. Wilson's accident, State Farm paid his claim up to $5,000 and that therefore his benefits have been exhausted.

In his response to the motion for summary judgment Plaintiff makes no argument that the aforesaid application fails to comply with *Flewellen*. Instead, Plaintiff has tendered his affidavit, stating "The signatures [shown on the insurance application] are not my signature."

*Cranford Case*

In his complaint filed April 14, 1982, Mr. Cranford alleges that he was injured in June 1980 in an automobile accident. At the time of the accident, he was covered under a fleet policy issued to Superb Maintenance Service, Inc. by Defendant Leader National. Plaintiff Hubert Cranford is the president of Superb Maintenance Service, Inc.

The complaint further alleges that at no time prior to the accident did Leader National make optional coverage above the $5,000 minimum coverage available to Superb in accordance with the requirements of Ga.Code Ann. § 56–3403b. When Plaintiff made his claim in 1980 following the accident, it was paid in the sum of $5,000 only.

The complaint alleges that on October 12, 1981, February 11, 1982, and March 16, 1982, letters were sent to Defendant Leader National electing additional post-risk coverage of $45,000.

Defendant filed a motion for summary judgment on May 29, 1984. Defendant contends the insurance application, rejecting optional no-fault coverage, is in substantial compliance with the requirements of Ga.Code Ann. § 56–3404b(b). It argues that no further benefits are owing, per the Georgia Supreme Court's decision in *St. Paul Fire & Marine Insurance Company v. Nixon*, 252 Ga. 469, 314 S.E.2d 215 (1984) (holding that the two-signature requirement of *Flewellen* is not a rigid requirement; substantial compliance is sufficient).

Responding to the motion for summary judgment, Plaintiff does not dispute Leader's argument that the format of the application complies with the Georgia no-fault act.[3] Instead, Hubert Cranford argues for the first time that the signature of his brother Harold Cranford on the insurance application is not his brother's signature, and that Harold never authorized anyone to sign his name.[4] Harold Cranford is the vice-president of Superb Maintenance.

*Sneed Cases*

These cases began when Plaintiff State Farm filed complaints for a declaratory judgment in each case in December, 1981.

---

**3.** However, on January 9, 1985, Plaintiff filed a motion for leave to file a motion for partial summary judgment. Plaintiff argues by way of that motion that the application is not in substantial compliance.

**4.** The support for Plaintiff's assertion is in the deposition of Harold Cranford taken May 23, 1984.

In C81–2303A (hereinafter the "Sneed, Sr." case) State Farm alleged that Sneed, Sr. had held a policy with State Farm for a number of years prior to 1975. The complaint does not allege what amount of coverage Sneed, Sr. had either before or after the no-fault act went into effect. However, it alleged that on or about October 6, 1978, Sneed, Sr. requested that his no-fault coverage be cut back to the statutory minimum of $5,000 and that this was done as requested. The complaint alleges that on or about September 11, 1979, Robert A. Sneed, Jr. was involved in an automobile accident. The complaint does not specifically allege, but appears to concede, that he was covered under the aforesaid Sneed, Sr. policy.

The complaint refers to and appends a copy of a November 11, 1981 letter on the letterhead of Robert A. Sneed Associates, PC, Attorneys at Law, addressed to a State Farm claims agent. The letter states that Sneed, Sr. desires to accept State Farm's continuing offer of $50,000 maximum benefits. The letter states that Sneed, Jr.'s accident-related expenses are "far in excess of the 'PIP' coverage of $5,000 in force at the time of the 9/11/79 accident."

State Farm's complaint in C81–2319A (hereinafter the "Sneed, Jr." case) is similar in format to that of the other case, but concerns a different policy and a different automobile accident which also happened to involve Sneed, Jr. This complaint alleges that in July 1976, Sneed, Jr. applied to State Farm for no-fault coverage. The complaint is silent as to what level of coverage Sneed, Jr. selected, but alleges that on or about October 4, 1978, Sneed, Jr. requested in writing that his coverage be reduced to the $5,000 minimum and that this reduction was effected in compliance with Sneed, Jr.'s request. Sneed, Jr. then was involved in an automobile accident on March 26, 1979 in which he sustained injuries. The complaint refers to and appends a copy of a letter dated November 11, 1981, from Robert A. Sneed, Sr., stating that his office had been retained by Sneed, Jr. to represent him, and that he on behalf of Sneed, Jr. accepts the continuing offer of

maximum optional personal injury protection benefits of $50,000.

In both the Sneed, Jr. and the Sneed, Sr. cases, State Farm asks the court to declare and adjudge that each Defendant is not entitled to any coverage in excess of the $5,000 statutory minimum.

In response to the complaints for declaratory relief, Sneed, Sr. and Sneed, Jr. each filed motions to dismiss for failure to state a claim. These were denied early in 1982. At that point, State Farm filed a motion for summary judgment in each case. These motions for summary judgment were supported by an affidavit of the service superintendent for one of State Farm's divisions. These affidavits affirmed the essential averments of State Farm's complaint in each case to the effect that the policies had been issued as alleged and that the relevant coverage amounts for each policy had been reduced to $5,000 by request of Sneed, Jr. or Sneed, Sr., as applicable. The Sneed filed no affidavits contesting these statements. However, their respective answers to the complaints (also filed in the spring of 1982) denied the averments that the insured had requested that coverage be reduced to the statutory minimum of $5,000.

On June 25, 1982, the court granted summary judgment to State Farm in both the Sneed, Jr. and the Sneed, Sr. case. The stated reason for granting summary judgment in the Sneed, Jr. case was this court's decision in *State Farm Fire & Casualty Co. v. Sweat*, 547 F.Supp. 233 (N.D.Ga. 1982) (holding that the Georgia appellate courts would not apply *Jones* retroactively). Judgment was granted to State Farm in the Sneed, Sr. case based on the court's reasoning in *Heflin v. State Farm Mutual Automobile Insurance Co.*, 547 F.Supp. 247 (N.D.Ga.1982) (holding that a no-fault insured had an obligation to examine his policy to ascertain that it contained the level of coverage he requested). The judgments were appealed to the United States Court of Appeals for the Eleventh Circuit. After the appeals were taken, the Georgia appellate courts decided a number of im-

portant cases in the no-fault area. These decisions caused State Farm to ask that both cases be remanded to this court by the Eleventh Circuit. The remand in each case occurred on January 18, 1984. 723 F.2d 1518.

After the remand, the court entered an order setting a period of time for discovery and a deadline for the filing of any further motions for summary judgment. The parties requested and obtained an extension of this deadline in order to attempt to settle the cases. However, the cases were not settled. In July 1984, State Farm filed another motion for summary judgment in each case. The basis of each motion is that State Farm has now tendered funds to the Sneeds for the total amount of medical bills and lost wages for which they have submitted a claim. A letter appended to State Farm's counsel's affidavit filed in support of the motions states that the check (which was made payable to Sneed, Jr. in the sum of $6,619.64) was for the full amount demanded by the Sneeds' then counsel, Don Keenan, at a settlement conference, and that this represented a tender in full of all expenses and lost wages shown on a worksheet prepared by Mr. Keenan and presented to State Farm. A copy of the itemized worksheet is also attached to State Farm's counsel's affidavit.

State Farm also offered in support of its motion in each case an affidavit of David E. Chandler, the agent who handled the Sneeds' policies. Mr. Chandler states that around September 1978 he discussed the coverage under both policies with Sneed, Sr. by telephone. He says that Sneed, Sr. stated "he had two teenage sons [5] and he wished to lower his premium expenses on the policies." Chandler says that in the phone conversation, Sneed, Sr. asked him to send selection cards to sign so he could reduce the personal injury protection coverage on the two policies, one of which was in the name of Sneed, Jr. Chandler states he mailed the selection cards to Sneed, Sr. The Chandler affidavit does not relate how the selection cards came back into his possession, but he asserts that on October 4,

1978, Sneed, Sr. signed both cards. Chandler's affidavit asserts that Sneed, Sr. requested that the coverage on each policy be adjusted as follows: "that the PIP limits be reduced to $5,000, that medical payments coverage be increased to $25,000 and that liability coverage for property damage be increased to $25,000."

The signature cards are identified by the Chandler affidavit and are attached to each motion for summary judgment. Each is signed "Robert A. Sneed." Each reflects notations, presumably made by Mr. Chandler, as follows: "C 5,000 to C25,000; B 10 to B 25; P to P 1."

Sneed, Jr. and Sneed, Sr. argue in response to State Farm's motion for summary judgment that State Farm is still liable to them because it did not honor their demands for excess coverage promptly enough. Therefore, penalties and attorneys' fees are still owed under the no-fault act. The Sneeds have offered no affidavits contesting the fact that $6,619.64 was the proper amount of money owed, disregarding penalties and attorneys' fees. They have tendered the affidavit of Sneed, Sr., dated August 3, 1984, which states flatly that his "signature" on the selection cards is a forgery, and that he never authorized anyone to sign the cards for him. He states he was not authorized to act for Sneed, Jr. either. He states that he never asked for his PIP coverage or that of his son to be reduced.

State Farm's response is that it reasonably awaited the Georgia Supreme Court's decision in *Tolison v. Georgia Farm Bureau Mutual Insurance Co.*, 253 Ga. 97, 317 S.E.2d 185 (1984) before deciding to pay the Sneeds' claims for excess coverage. In *Tolison*, the Georgia Supreme Court made it clear that Jones claims, as modified by *Flewellen*, are not dependent in any way on whether or not the insured actually agreed to waive excess coverage. In so holding, the Georgia Supreme Court reversed the Georgia Court of Appeals. State Farm argues, then, that its tender of payment in full within 30 days following

---

**5.** In 1978 Sneed, Jr. was still living at home with his parents.

announcement of the *Tolison* decision means that it is not liable for any penalties under the no-fault act; therefore, it has fulfilled all its obligations to the Sneeds and is entitled to judgment in its favor in each case as a matter of law.

The Sneeds' rejoinder is that *Tolison* added nothing to the law not already made clear by the Georgia Supreme Court's decision in *Flewellen* a year before *Tolison*.

At this point, the Sneeds do not merely seek imposition of bad faith penalties and attorneys' fees under the specific provisions of the no-fault act. On October 31, 1984, each of the Sneeds filed a motion for leave to assert a counterclaim against State Farm. This proposed counterclaim asserts a fraud cause of action against State Farm based on the alleged forgery of the signatures of Sneed, Sr. on the coverage cards—the documents reducing the coverage on each policy to $5,000. The Sneeds seek "special damages in an amount as yet to be determined" and punitive damages in the sum of 2½ million dollars. The motions for leave to file the counterclaims assert that the counterclaims did not mature until after the original answers were filed. Sneed, Sr. states, in an affidavit that he did not know until the spring of 1984 that his signature on the two cards had been forged. According to the affidavit, it was not until then that the Sneeds obtained copies of the coverage cards.

In summary, the *Sneed* cases are before the court on State Farm's motions for summary judgment on its complaints for declaratory relief, and on the Sneeds' motions for leave to file an amended answer and counterclaim in each case.

## B. LEGAL DISCUSSION

In *Jones v. State Farm,* 156 Ga.App. 230, 274 S.E.2d 623 (1980) (*cert. dismissed*), and in *Flewellen v. Atlanta Casualty Company,* 250 Ga. 709, 300 S.E.2d 673 (1983), the Georgia appellate courts implicitly held that O.C.G.A. § 33–34–5(b) (formerly Ga.Code Ann. § 56–3404b(b)) creates a private right of action. That code section provides:

Each application for a policy of motor vehicle liability insurance sold in this state must contain separate spaces for the insured to indicate his acceptance or rejection of each of the optional coverages listed in subsection (a) of this Code section and no such policy shall be issued in this state unless these spaces are completed and signed by the prospective insured.

Both *Jones* and *Flewellen* were cases in which the insured claimed that the defective format of the insurance application had resulted in defective rejection of the optional PIP coverage. In *Flewellen,* the Georgia Supreme Court held that:

The requirements of subsection (b) are satisfied by two signatures, one for acceptance or rejection of optional PIP and another to indicate acceptance or rejection of vehicle damage coverage.

*Id.* at 711, 300 S.E.2d 673. The court further held that

... The failure to reject the options in the manner provided in the statute results in acceptance of the minimum coverage required to be offered which is $50,000. The absence of a rejection forms a contract for $50,000 PIP from its inception.

*Id.* at 715, 300 S.E.2d 673. The Georgia Supreme Court observed in *Flewellen:*

The purpose of the statute is to resolve conflicts which arise when an insured contends that he was not informed of his statutory right to optional benefits. When this claim is made, the resolution of the issue will be to look to the policy to determine if there was reduction or rejection of those benefits in conformance with the statutory scheme.

*Id.* at 714, 300 S.E.2d 673.

In *St. Paul Fire & Marine Insurance Company v. Nixon,* 252 Ga. 469, 314 S.E.2d 215 (1984), the Georgia Supreme Court held that where it was clear *from the form of the application* that the intent of the insured was to reject optional PIP benefits and vehicle damage protection, there was substantial compliance with the statute and therefore the insured had no *Jones* claim.

Shortly after *St. Paul* was decided, the Georgia Supreme Court decided *Tolison v. Georgia Farm Bureau Mutual Insurance Company*, 253 Ga. 97, 317 S.E.2d 185 (1984). It held, in part, that the Georgia Court of Appeals had erred in ruling that conflicting testimony of the insured and the insurer concerning whether the insured had been informed of his right to optional coverage should be presented to the jury. In so deciding, the court referred to *Flewellen* as establishing a "method of conflict resolution." *Id.* at 101, 317 S.E.2d 185.

Although O.C.G.A. § 33–34–5(b) has been the subject of extensive interpretation by the Georgia appellate courts, as of this date there has been no decision listing the elements of a Jones cause of action, or specifically denominating the cause of action as lying in tort or contract. Based on *Flewellen, St. Paul,* and *Tolison,* it appears that *Jones* claims are not tort claims in which a private right of action is based on violation of a regulatory statute. The language of *Flewellen* strongly suggests that these are breach of contract cases. Secondly, the Georgia Supreme Court has not set forth any requirement that the insured prove private injury flowing from the insurer's breach of the statute. In fact, *Tolison* excludes this from the trier of fact's consideration. It is true that *Flewellen, St. Paul,* and *Tolison* all refer to Jones theory as a method of resolving disputes between insurers/insureds over coverage, but since a claim that the optional coverage was not offered is not an element of the Plaintiff's cause of action [6], nor (apparently) a matter which may be addressed by way of defense, the insured need not be someone who claims that he was not offered optional coverage. Therefore, there is no requirement of private injury flowing from the insurer's breach of duty. The absence of such injury requirement is in-consistent with categorizing these cases as tort cases.

■ Therefore, the court concludes that *Flewellen* and other application format cases are properly categorized as breach of contract cases. The contract is for $50,000 PIP benefits, *i.e.,* $5,000 mandatory minimum PIP plus the maximum $45,000 optional PIP benefits. (hereinafter Jones contracts). As to policies purchased after the effective date of the no-fault act (March 1, 1975), *Flewellen* and *St. Paul* hold that where an insurer offers optional PIP coverage through an application that does not meet the format requirements of O.C.G.A. § 33–34–5(b), this triggers the creation of a Jones contract. In such cases, neither party's intent as to what level of coverage was sought or desired is relevant; the insured need not claim there was a failure to offer optional coverage, or that he was unaware of this coverage; the $50,000 contract is formed by operation of law. *Flewellen, supra* 250 Ga. at 712, 714, 300 S.E.2d 673; *Tolison, supra* 253 Ga. at 100–101, 317 S.E.2d 185.

However, § 33–34–5(b) does not merely contain format requirements for the insurance application. Rather, that code section reads:

(b) Each application for a policy of motor vehicle liability insurance sold in this state must contain separate spaces for the insured to indicate his acceptance or rejection of each of the optional coverages listed in subsection (a) of this Code section and *no such policy shall be issued in this state unless these spaces are completed and signed by the prospective insured.* (Emphasis supplied).

The references in the statute to "completed" and "signed" are references to marking the blocks corresponding to various levels of coverage and to signing so as

---

6. Jones complaints involving policies issued after March 1, 1975, typically allege that the plaintiff insured purchased PIP coverage from the defendant insurer in the $5,000 minimum amount; that the insurer failed to offer the optional coverages "in the manner required" by Ga.Code Ann. § 56–3404b(b) (now O.C.G.A. § 33–34–5(b)); that the insured was subsequent-ly injured in an accident covered by the policy; that the insured now has tendered the premium for maximum optional PIP coverage; that the expenses and losses covered by the accident exceed the $5,000 minimum coverage; and that the insurance company refuses to pay benefits above the $5,000 minimum.

to indicate personal acceptance of the indicated levels of coverage. *See St. Paul, supra; GEICO v. Mooney,* 250 Ga. 760, 761, 300 S.E.2d 799 (1983); *Flewellen; supra.* The issue now before the court is whether the plaintiff insured's allegation that the signature on the application is not his, if proven, triggers the automatic creation of a Jones contract as in the format cases. Or, must the insured allege and prove that he did not knowingly reject optional PIP coverages?

The parties have pointed out no Georgia Supreme Court decisions which deal with the faulty signature issue nor has the court been able to locate any. There are a number of decisions of the Georgia Court of Appeals which treat this issue, or a similar issue. In *Holt v. International Indemnity Company,* 171 Ga.App. 817, 321 S.E.2d 374 (1984) *(cert. denied)* and *Miller v. State Farm Mutual Automobile Insurance Company,* 155 Ga.App. 487, 271 S.E.2d 14 (1980) *(cert. denied),* the Georgia Court of Appeals considered faulty signature claims. In *Miller,* the court rejected plaintiff's argument that she was entitled to a Jones recovery, based on faulty signature, where she had signed an insurance application on behalf of her husband (the insured), and had rejected optional PIP coverage pursuant to her husband's express authorization. The court held that she was estopped to claim that she had signed her husband's name without proper authority. In *Holt,* the court held that when the husband of the insured filled out the application, rejecting optional coverage, that a Jones contract was created, even though the husband acted in his wife's presence and at her express direction. *Holt* distinguished *Miller* by noting that there, the plaintiff herself had signed the rejection of optional coverage, and admitted doing so. In *Holt,* the plaintiff was the insured's son who had not been involved in obtaining the policy.

In *Allstate Insurance Company v. O'Brien,* 172 Ga.App. 693, 324 S.E.2d 498 *Allstate Indemnity Company,* 173 Ga. App. 114, 325 S.E.2d 599 (1984), the Georgia Court of Appeals has recently considered the effect of someone else's marking the

rejection blocks on the insurance application, with the insured signing the application. In both of these cases, the Georgia Court of Appeals held, by implication at least, that no Jones recovery is authorized when the insured has expressly stated a desire to reject certain coverage, and that election is accurately reflected in the "reject" boxes filled out by someone else. Therefore, at least as to the matter of marking the reject blocks, under *O'Brien* and *Miller* the key issue is authorization, not whether the insured personally marked the blocks.

Finally, the Georgia Court of Appeals has decided two cases, *Morris v. Fidelity & Casualty Company of New York,* 169 Ga. App. 883, 315 S.E.2d 451 (1984) and *National Indemnity Company v. Smith,* 172 Ga.App. 415, 323 S.E.2d 274 (1984) where authenticity of signature was questioned, but no Jones recovery was allowed because the insurance application was not accepted directly from the insured by the insurance company. Instead, the paperwork was handled by an independent party who was not an agent of the insurance company. In *Morris* and *Smith,* the Georgia Court of Appeals did not indicate what rule would be applied if the party handling the application form *had* been the agent of the company.

Because the Georgia Supreme Court has not ruled on the faulty signature issue, this court cannot predict with certainty whether it will choose to extend the automatic contract theory of "application format" cases such as *Flewellen* to faulty signature cases. The Georgia Court of Appeals decisions do not directly address this point. However, *Holt* and *Miller v. State Farm* are clearly contract theory cases; *Morris* and *Smith* implicitly recognize the relevance of the concept of fault, thereby suggesting tort theory. *O'Brien* and *Miller v. Allstate* seem more compatible with tort theory because they implicitly address the question whether the insured has sustained actual injury arising from the lack of a personal "marking" of the application.

The question whether a claim of actual injury should be an element of the cause of action can be argued both ways. On the one hand, anything less than the insured's own signature on the application undercuts the statute's purpose—making sure that the insured is truly informed of the availability of optional coverage. On the other hand, allowing recovery based only on faulty signature, with no requirement of actual injury, obviously gives a recovery to plaintiffs who are not injured. The justification for the "automatic contract" approach in the format cases is that it aids in speedy resolution of claims. But faulty signature cases generally involve issues of fact which must be resolved at trial, even if intent, knowledge and authorization are not relevant concepts. In any event, one must look outside the policy.

■ In the absence of a definitive ruling by the Georgia Supreme Court, the court applies the holdings of the Georgia Court of Appeals in these diversity cases. Although the decisions are not entirely harmonious, the court finds, especially in the Court of Appeals' more recent decisions in *Miller* and *O'Brien* recognition of a private injury requirement which makes the issue of whether the insured was actually informed of the optional coverage, and knowingly rejected it, relevant. Moreover, resolution of the issues once a faulty signature claim has been made requires looking outside the policy (unlike the format cases) and most often will require a trial in any event. Omitting inquiry into the issue of authorization will not materially speed resolution of these claims. Finally, in cases where the insured is a corporation (*e.g., Cranford*), the insured necessarily must act through an authorized agent. Therefore, the court holds that in the faulty signature cases now pending, each insured must plead and prove the precise manner in which the insurer breached its duty under the statute and in what respect Plaintiff was injured by the breach. The allegation that the insurer failed to offer the optional coverage "in the manner required" by Georgia Code Ann. § 56–3404b(b) (now O.C.G.A. § 33–34–5(b)) is insufficient to place the insurance company on notice of the relevant allegations.

The foregoing ruling is now applied in each of the cases before the court.

In *Wilson*, the court holds that State Farm's insurance application complies with the Georgia Supreme Court's ruling in *Flewellen*. A ruling on State Farm's motion for summary judgment is DEFERRED for 20 days. If Plaintiff wishes to file a proposed amendment to his complaint in the interim, he may do so. The Clerk is DIRECTED to resubmit the file at the conclusion of the 20-day period.

In *Cranford*, the court finds that Leader National's insurance application is in substantial compliance with the requirements of O.C.G.A. § 33–34–5(b). The application consists of two pages. The first page is a general application form, which elicits information from the applicant, and which ends with a signature space for the applicant. The second page is in three parts with heavy black lines separating the sections. The first section is an equipment schedule, wherein the company's vehicles are listed, together with the names and certain information about each vehicle operator. The second section states, in large capital letter in the upper left hand area "PREMIUM FINANCE TERMS AND CONDITIONS *READ BEFORE YOU SIGN*!" However, the second section also deals in part with the rejection of uninsured motorist coverage, and contains blocks to accept or reject such coverage. The third section deals with various types of no-fault coverage, namely, PIP, loss of use, and collision coverage. The section reads: [7]

> ADDITIONAL PIP COVERAGE INSTRUCTIONS—I understand that the company to whon I make this application has *offered me the option to purchase:* "ADDITIONAL PERSONAL INJURY PROTECTION" up to a limit of $50,000 total. "LOSS OF USE" Insurance covering certain expenses up to $10 per day, $300 total. "FULL COVERAGE COLLI-

---

7. This section of the policy is not arranged as compactly as appears herein. Also, the words appearing in capitalized letters are not as large as the "PREMIUM FINANCE," etc., heading of section two. Section three also contains accept/reject blocks for loss of use and collision coverage which are not shown here.

SION AND COMPREHENSIVE COVERAGE". Understanding these coverages and having been advised of the premium for each, I hereby sign this acceptance or rejection, for this policy and any renewals thereof, and request the policy issued:

( ) WITH ADDITIONAL PERSONAL ( ) $10,000 LIMIT
 INJURY PROTECTION ( ) $25,000 LIMIT
 OR ( ) $50,000 LIMIT

( ) WITHOUT ADDITIONAL PERSONAL
 INJURY PROTECTION

Immediately under that is a space for the date and a space for the insured's signature.

In Chief Justice Hill's concurring opinion in *St. Paul,* he stressed a key factor for finding substantial compliance, namely, that the application contain a signature applicable only to the acceptance/rejection of optional no-fault coverage, as well as the usual signature for the application as a whole.

Cranford's argument here is that the signature at the bottom of section three (the option no-fault section) is actually meant to relate to the uninsured motorist coverage in section two as well. Therefore, Cranford argues, the application does not meet Justice Hill's stated test.

■ The court rejects Cranford's claim. It is clear that the signature space in section three relates to the acceptance/rejection of optional no-fault coverage. The uninsured motorist accept/reject blocks simply do not have a signature space. No one could mark or sign section three without being on notice of the right to optional PIP coverage, and making an intentional election. Therefore, the format is in substantial compliance with O.C.G.A. § 33–34–5(b) under *St. Paul.*

The court therefore must turn [8] to Plaintiff's argument that the faulty signature of Harold Cranford deprives Defendant of the right to summary judgment. For the reasons set forth in this order, a ruling on Leader National's motion for summary judgment is hereby DEFERRED. If Plaintiff wishes to file a proposed amendment to his complaint in the interim, he may do so.

**8.** The court notes Leader National's argument that there can be no Jones recovery because the application was not handled by its agent, per

The Clerk is DIRECTED to resubmit the file at the conclusion of the 20-day period.

In the *Sneed* cases, State Farm's motions for summary judgment are GRANTED; the Sneeds' motions for leave to file an amended answer and counterclaim are DENIED.

At the outset, the court notes that that these cases may not be Jones cases at all, even though both sides have argued that they are. The Sneed, Sr. policy predated the no-fault act. Therefore, any Jones recovery would necessarily be based on State Farm's failure to offer optional coverage to Sneed, Sr. in accordance with the requirements of O.C.G.A. § 33–34–5(c), as interpreted by the Georgia Supreme Court in *Stafford v. Allstate Insurance Company,* 252 Ga. 38, 311 S.E.2d 437 (1984). The Sneed, Jr. policy was issued after the effective date of the no-fault act, but neither side has addressed whether, when the policy was originally issued, State Farm obtained a proper rejection of optional no-fault coverage pursuant to O.C.G.A. § 33–34–5(b). If Sneed, Jr. has a Jones contract, it necessarily would have arisen at the time when he made application for his policy.

Instead, the stated claims of Sneed, Sr. and Sneed, Jr. arise from the reduction of their coverage in 1978. Both sides assert that immediately prior to this time frame, each of the Sneeds had $25,000 in optional PIP coverage. The issue is whether, when State Farm reduced the PIP coverage to $5,000 in 1978, such reduction was in accordance with the request of their insureds or rather was effected unilaterally by State Farm. The court is unable to see, assuming that such reduction was unilateral, how this gives rise to a Jones cause of action as opposed to a garden variety breach of contract action. Perhaps this lack of clarity stems from the fact that these cases were initiated by declaratory judgment actions, which did not focus the issues very sharply.

It appears, however, that it is unnecessary to resolve this issue. Assuming that

*Morris.* The facts regarding agency, or lack of agency, are not clear enough for summary judgment, however.

**1456**

these are Jones cases, the court agrees with State Farm that it was reasonable for it to await the Georgia Supreme Court's decision in *Tolison* before tendering a check for optional benefits. The mere fact that the Georgia Court of Appeals in *Tolison* initially ruled in favor of State Farm's position shows that *Flewellen* had not totally clarified the law. Accordingly, no penalties or attorney's fees are owed due to State Farm's failure to pay immediately after *Flewellen* was decided.

Assuming that the Sneeds never authorized reduction of their PIP benefits in 1978 from $25,000 to $5,000 per policy, the court still finds that State Farm is entitled to prevail on its motion. The affidavits tendered in favor of State Farm's motions for summary judgment state that on June 21, 1984, the Sneeds' counsel presented a list of medical expenses and lost wage items to State Farm. Immediately thereafter, a check was tendered to the Sneeds which represented payment of the expenses and losses which had been presented to State Farm (and not previously paid). The Sneeds did not contest this by counter-affidavit. Therefore, there is no evidence before the court of dilatory payment.

The remaining matter is the Sneeds' request to amend their pleadings to assert a counterclaim. Two factors influence the court to deny the motions. First, and more importantly, they come very late in this litigation. These counterclaims could have been asserted much earlier. It should not have been necessary for the Sneeds to see the coverage cards to determine that any reduction of coverage was fraudulent. A faulty signature, alone, does not necessarily mean fraud or even lack of authorization. Secondly, it appears doubtful that the Sneeds could prevail on these counterclaims. Sneed, Sr.'s November 1981 letter to State Farm stating his understanding that his policy contained only the $5,000 minimum PIP coverage is inconsistent with his current claim that he thought the policy had $25,000 PIP coverage.